IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| **DAVID FANCHER; LEE FUTRELL;** | ) | Civil Action No.: 2:22-cv-00026 |
| **JOHN ORUE; CRAIG UNTERBERG;** | ) | |
| **ARIEL ALVARADO; DENNIS TOLES;** | ) | |
| **CAROLE CARLSON; DENNIS MONROE;** | ) | |
| **and RICHARD HENDERSON,** | ) | **COMPLAINT** |
| | ) | **JURY TRIAL DEMANDED** |
| **Plaintiffs,** | ) | |
| | ) | Kidney Cancer |
| **vs.** | ) | |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## INTRODUCTION

Plaintiffs DAVID FANCHER; LEE FUTRELL; JOHN ORUE; CRAIG UNTERBERG;
ARIEL ALVARADO; DENNIS TOLES; CAROLE CARLSON; DENNIS MONROE; and
RICHARD HENDERSON (collectively "Plaintiffs") file this Complaint against Defendant
UNITED STATES OF AMERICA ("Defendant"). This Complaint alleges a federal cause of
action and is brought solely pursuant to Section 804(b) of the "Sergeant First Class Heath Robinson
Honoring our Promise to Address Comprehensive Toxics (PACT) Act," also known as the "Camp
Lejeune Justice Act of 2022" (hereinafter "the Act"). Plaintiffs allege the following:

1.      For decades the water at Marine Corps Base Camp Lejeune was contaminated with
toxic chemicals known to cause cancer and a host of other chronic—often deadly—diseases and
conditions. Hundreds of thousands of servicemembers and civilians drank, bathed in, cooked with,
and swam in that water. Nevertheless, in violation of governing orders and basic duties of decency,
federal government officials failed to ensure that toxic chemicals from industrial facilities, fuel

tanks, and dry-cleaning operations did not seep into the water used by the men and women who were willing to lay their lives on the line for our nation and their families. Indeed, for decades the federal government did not even bother to test the water.

2. Thousands of servicemembers and civilians who resided at Camp Lejeune between the 1950s and the 1980s have contracted serious diseases and chronic conditions as a result of their exposure to the contaminated water, including but not limited to: kidney cancer; non-Hodgkin's lymphoma; multiple myeloma; leukemia; liver cancer; bladder cancer; chemically-induced parkinsonism; end-stage renal disease; systematic sclerosis/scleroderma; and cardiac defects. Camp Lejeune's toxic water has also been linked to widespread birth defects and high rates of stillborn babies.

3. At all times relevant, Plaintiffs were unable to mitigate their individual damages as the result of the Defendant's failure and refusal to provide its knowledge and information as it concerns the health consequences of exposure to the contaminants to which the Plaintiffs were exposed.

4. When the truth about Camp Lejeune's water finally emerged in the late 2000s, the United States faced thousands of claims for compensation on behalf of the people injured or killed by its conduct. But instead of compensating servicemembers and others for their injuries, the United States steadfastly refused to pay their claims. When lawsuits were filed under the Federal Tort Claims Act ("FTCA") in federal court, the United States escaped liability by invoking North Carolina's ten-year statute of repose—which operated to bar all of the claims even though the federal government's misconduct had not come to light until well after the statutory period had run.

2

5.      Now the United States has finally decided to fulfill its obligation to servicemembers, their families, and civilians who resided at the base during the period in which the water was contaminated.  Section 804(b) of the Act establishes a simple cause of action permitting individuals who were harmed by the contaminated water at Camp Lejeune over the relevant period of time to obtain relief in this Court.  Specifically, "[a]n individual . . . who resided, worked, or was otherwise exposed (including in utero exposure) for not less than 30 days during the period beginning on August 1, 1953, and ending on December 31, 1987, to water at Camp Lejeune, North Carolina, that was supplied by, or on behalf of, the United States may bring an action in the United States District Court for the Eastern District of North Carolina to obtain appropriate relief for harm that was caused by exposure to the water at Camp Lejeune." *Id.*  To meet the burden of proof, a plaintiff need only "produce evidence showing that the relationship between exposure to the water at Camp Lejeune and the harm is . . . sufficient to conclude that a causal relationship is at least as likely as not." Section 804(c)(2) of the Act.

## THE PARTIES, JURISDICTION, AND VENUE

6.      Plaintiff DAVID FANCHER is currently a resident of DeLand, Florida.  Between August 1, 1953 and December 31, 1987, Plaintiff resided, worked or was otherwise exposed for not less than thirty (30) days to water at Camp Lejeune, North Carolina, that was supplied by, or on behalf of, the United States.

7.      Plaintiff LEE FUTRELL is currently a resident of Hartsville, South Carolina. Between August 1, 1953 and December 31, 1987, Plaintiff resided, worked or was otherwise exposed for not less than thirty (30) days to water at Camp Lejeune, North Carolina, that was supplied by, or on behalf of, the United States.

8.     Plaintiff JOHN ORUE is currently a resident of Greenfield Township, Pennsylvania.  Between August 1, 1953 and December 31, 1987, Plaintiff resided, worked or was otherwise exposed for not less than thirty (30) days to water at Camp Lejeune, North Carolina, that was supplied by, or on behalf of, the United States.

9.     Plaintiff CRAIG UNTERBERG is currently a resident of New York, New York. Between August 1, 1953 and December 31, 1987, Plaintiff resided, worked or was otherwise exposed for not less than thirty (30) days to water at Camp Lejeune, North Carolina, that was supplied by, or on behalf of, the United States.

10.     Plaintiff ARIEL ALVARADO is currently a resident of Hollywood, Florida. Between August 1, 1953 and December 31, 1987, Plaintiff resided, worked or was otherwise exposed for not less than thirty (30) days to water at Camp Lejeune, North Carolina, that was supplied by, or on behalf of, the United States.

11.     Plaintiff DENNIS TOLES is currently a resident of Virginia Beach, Virginia. Between August 1, 1953 and December 31, 1987, Plaintiff resided, worked or was otherwise exposed for not less than thirty (30) days to water at Camp Lejeune, North Carolina, that was supplied by, or on behalf of, the United States.

12.     Plaintiff CAROLE CARLSON is currently a resident of New Port Richey, Florida. Between August 1, 1953 and December 31, 1987, Plaintiff resided, worked or was otherwise exposed for not less than thirty (30) days to water at Camp Lejeune, North Carolina, that was supplied by, or on behalf of, the United States.

13.     Plaintiff DENNIS MONROE is currently a resident of Spring Hill, Tennessee. Between August 1, 1953 and December 31, 1987, Plaintiff resided, worked or was otherwise

exposed for not less than thirty (30) days to water at Camp Lejeune, North Carolina, that was supplied by, or on behalf of, the United States.

14.     Plaintiff RICHARD HENDERSON is currently a resident of Cary, North Carolina. Between August 1, 1953 and December 31, 1987, Plaintiff resided, worked or was otherwise exposed for not less than thirty (30) days to water at Camp Lejeune, North Carolina, that was supplied by, or on behalf of, the United States.

15.     Defendant United States of America is the party responsible for damages caused by its military service components, including responsibility for the United States Navy and United States Marine Corps and related facilities. Defendant has waived its sovereign immunity from suit under Section 804(f) of the Act.

16.     The United States District Court for the Eastern District of North Carolina has exclusive jurisdiction over any action filed under Section 804(b) of the Act and is the exclusive venue for this action. Section 804(d) of the Act. This Court also has jurisdiction pursuant to 28 U.S.C. § 1331. Moreover, the amount in controversy exceeds $75,000, exclusive of interest and costs.

## CONDITIONS PRECEDENT

17.     All conditions precedent to the filing of this action and to the Plaintiffs' right(s) to the relief sought have occurred, have been performed, or have been excused.

## FACTUAL ALLEGATIONS

18.     Established in 1941, Camp Lejeune has long served as a major training facility for the Marine Corps. At all times relevant, Defendant owned, controlled and/or operated the military base, to include its water supply and distribution system, located at and known as Camp Lejeune, North Carolina.

19.     Historically, Camp Lejeune's drinking water was extracted from over 100 supply wells, treated at eight treatment plants, and distributed to its residents through a network of water distribution system pipelines. The base housing areas were served by among others, three main water supply and distribution systems that served the base: Tarawa Terrace (beginning in 1952); Holcomb Boulevard (starting June 1972); and Hadnot Point (beginning in 1942). Those systems consisted of a collection of wells, a water treatment plant, and a distribution system.

20.     Beginning in the mid-1950s, toxic chemicals from various sources, including unlined landfills and leaking storage tanks, seeped into the soil and groundwater of Camp Lejeune and ultimately contaminated many of the wells used to supply the water-treatment plants.

21.     In 1979, the United States Environmental Protection Agency ("EPA") promulgated regulations governing drinking water under the Safe Drinking Water Act of 1974, 42 U.S.C. §§ 300f *et seq.* To comply with those regulations, the Camp Lejeune water utility began testing drinking water at the base.

22.     During December 1980 – March 1981, as part of a sampling program at Camp Lejeune, water utility documents indicated "water highly contaminated with other chlorinated hydrocarbons (solvents)!". In 1982, testing determined that the drinking water at both the Hadnot Point plant and the Tarawa Terrance water treatment plant was contaminated by volatile organic compounds far in excess of safe levels. Defendant allowed various pollutants and contaminants, such as tetrachloroethylene (also known as perchloroethylene or "PCE"), trichloroethylene ("TCE"), dichloroethylene, vinyl chloride and benzene to exist in the base water supply in quantities that were dangerous to the life, health and welfare of those to whom it was supplying the water, including the Plaintiffs.

23.     In fact, when the tap water was tested in or about May 1982, the TCE level in the Hadnot Point distribution system of Camp Lejeune was as high as 1,400 parts per billion; PCE, vinyl chloride and benzene were also detected in the Hadnot Point distribution system during sampling conducted on or after December 1984.

24.     In the July 1982 testing of the Tarawa Terrace distribution system, there were 104 parts per billion of TCE in the water supply.

25.     When testing was performed in or about February 1985, the TCE in the water supply and distribution system was as high as 1148 parts per billion and the dichloroethylene level as high as 406 parts per billion in the Berkeley Manor Elementary School area of Camp Lejeune. The PCE level was 215 parts per billion, with one well supplying the water at Camp Lejeune having 18,900 parts per billion of TCE, 400 parts per billion of PCE, 8,070 parts per billion of dichloroethylene and 655 parts per billion of vinyl chloride.

26.     In addition to the Hadnot Point and Tarawa Terrace distribution systems, the Holcomb Boulevard distribution system was intermittently contaminated by Hadnot Point water between 1972 and 1985. And as noted above, before 1972, the Holcomb Boulevard area was supplied with water by the Hadnot Point system.

27.     The current U.S. maximum contaminant levels ("MCLs") for TCE and PCE are 5 ppb. The MCLs for vinyl chloride and benzene are 2 ppb and 5 ppb, respectively. The MCLs for TCE, vinyl chloride and benzene were in effect as of 1989, and the MCL for PCE was in effect as of 1992. Historical reconstruction modeling of the drinking water contamination at Camp Lejeune indicated that TCE and PCE levels above their current MCLs were present in the distribution systems since the 1950s. The most highly contaminated supply wells serving these systems were shut down by February 1985.

28.     Subsequently, Camp Lejeune was placed on the EPA's National Priorities List ("NPL") on November 4, 1989 and declared to be a federal Superfund site because of the hazardous, wide-spread high-level of contamination at the base. By 1991, all groundwater contaminant investigations and remediation activities at Camp Lejeune were placed under the oversight of the Defendant's Comprehensive Environmental Response, Compensation and Liability Act and the Resource Conservation and Recovery Act.

29.     Once placed on the NPL, the United States Agency for Toxic Substances and Disease Registry ("ATSDR"), a statutorily created agency and operating division within the Department of Health and Human Services, at the direction and/or request of Defendant's Department of Defense, is responsible for completing a Public Health Assessment ("PHA"). In 1997, the ATSDR completed and published a PHA for Camp Lejeune concluding that individuals who served or resided at Camp Lejeune had been exposed to contaminants of concern in the drinking water.

30.     The 1997 ATSDR PHA was removed from the agency's website in 2009 after new information emerged, including the fact that benzene had been present in a well in the Hadnot Point system.

31.     After the removal of the 1997 PHA, the ATSDR completed five health studies of Camp Lejeune:

(i)     A 2013 study of whether *in utero* and infant exposures to contaminated drinking water were associated with birth defects suggested an association between drinking water contaminants and neural tube defects.

(ii)    A 2014 study compared mortality rates among Marine and naval personnel stationed at Camp Lejeune with mortality rates for Marine Corps personnel stationed at

Camp Pendleton, a Marine Corps base located in Oceanside, California. The study found an elevated mortality rate for the Camp Lejeune personnel for several causes of death, including multiple myeloma, Hodgkin lymphoma, and cancers of the kidney, liver, esophagus, and cervix.

(iii)     A 2014 study found that civilians who worked at Camp Lejeune from 1973 to 1985 had elevated mortality hazard ratios for kidney cancer, leukemias, multiple myelomas, rectal cancer, oral cavity cancer, and Parkinson's disease.

(iv)     A 2014 study of mothers who lived at Camp Lejeune at the time of delivery suggested associations between TCE exposure and low birth weight and other birth issues. It also found an association between PCE exposure and the risk of preterm birth and an association between benzene exposure and term low birth weight.

(v)     A 2015 study identified associations between exposure to PCE and other chemicals in the Camp Lejeune drinking water and male breast cancer.

32.     In January 2017, the ATSDR published a superseding PHA for Camp Lejeune. The 2017 PHA reached a number of conclusions about the water supply at Camp Lejeune:

(i)     **Hadnot Point Water System.** The 2017 PHA concluded that "[r]esidents, workers, Marine and naval personnel, and Marines-in-training at MCB Camp Lejeune were in the past exposed to contaminants in drinking water supplied by the Hadnot Point [water treatment plant]." It further concluded that "this contaminant exposure was at levels that could have harmed their health" and that "[t]he estimated levels to which all the above-mentioned groups of people were exposed could have resulted in an increased cancer risk and increased potential of experiencing adverse, noncancer health effects." According to

9

the ATSDR, "[t]richloroethylene (TCE) and vinyl chloride were the chemicals that contributed most to the increased cancer risk."

(ii)     **Tarawa Terrace Water System**.  The 2017 PHA concluded that "the Tarawa Terrace [water treatment plant] might have harmed the health of young children," including through "an increased risk of cancer," and that "Marines living in the Tarawa Terrace area who were exposed to water from the Hadnot Point [water treatment plant] during training may have had a higher risk of health-related problems."

(iii)    **Holcomb Boulevard Water System**.  The 2017 PHA concluded that prior to 1972, when the Holcomb Boulevard Water System was served by the Hadnot Point water treatment plant, residents' exposure to contaminants "could have resulted in an increased cancer risk and increased potential of experiencing adverse, noncancer health effects."

(iv)     **Lead exposure**.  The 2017 Public Health Assessment concluded that "past exposure to lead found in tap water at 19 locations could have harmed people's health."

(v)      **Other Exposures.**  The 2017 PHA concluded that Marines and civilians who trained in indoor swimming pools in the Hadnot Point area between the early 1950s and 1985, as well as civilians who worked at laundry facilities, were exposed to contaminants at levels that might have harmed their health.

33.      In 2017, ATSDR published its "Assessment of the Evidence for the Drinking Water Contaminants at Camp Lejeune and Specific Cancers and Other Diseases." As part of its mandate, ATSDR completed several epidemiological studies to determine if Marines, Navy personnel and civilians residing and working on U.S. Marine Corps Base Camp Lejeune were at increased risk for certain health effects as a result of exposure to water contaminated with volatile organic compounds.

34. The 2017 ATSDR report concluded that a causal relationship exists between the following diseases and the contaminants in the Camp Lejeune water supply or a causal relationship is at least as likely as not: kidney cancer; non-Hodgkin's lymphoma; multiple myeloma; leukemia; liver cancer; bladder cancer; Parkinson's disease; end-stage renal disease; systematic sclerosis/scleroderma; and cardiac defects.

35. Through statutory enactments and regulatory actions, Congress and the Executive Branch have both recognized the link between exposure to Camp Lejeune's contaminated water and a number of serious diseases and conditions.

36. In 2012, Congress enacted the Honoring America's Veterans and Caring for Camp Lejeune Families Act, Pub. L. No. 112-554, 126 Stat. 1165. Title I of the statute is entitled the Janey Ensminger Act, in honor of a nine-year-old girl who died of a cancer that she developed from exposure to the water at Camp Lejeune. *Id.* § 101, 126 Stat. 1167.

37. The Janey Ensminger Act provides that veterans and their families (including babies who were *in utero*) who served or resided at Camp Lejeune for at least 30 days between 1957 and 1987 are entitled to receive hospital care and medical benefits for fifteen specified illnesses or conditions without having to prove a connection between a veteran's military service and the illness or condition. 38 U.S.C. § 1710(e)(1)(F), 1787(a) (2012). Those illnesses and conditions are esophageal cancer, lung cancer, breast cancer, bladder cancer, kidney cancer, leukemia, multiple myeloma, myelodysplastic syndromes, renal toxicity, hepatic steatosis, female infertility, miscarriage, scleroderma, neurobehavioral effects, and non-Hodgkin's lymphoma. 38 U.S.C. § 1710(e)(1)(F).

38. Congress later expanded the pool of victims eligible for hospital care and medical benefits to those who had served or resided at Camp Lejeune as early as August 1, 1953.

Case 5:22-cv-00315-D-RN   Document 1   Filed 08/10/22   Page 11 of 21

Consolidated and Further Continuing Appropriations Act, 2015, Div. I, Tit. I, § 243, Pub. L. No. 113-235 (codified at 38 U.S.C. § 1710(e)(1)(F)).

39.     In January 2017, the U.S. Department of Veterans Affairs promulgated a regulation establishing that veterans exposed to the water at Camp Lejeune are entitled to certain disability benefits.  Final Rule, Diseases Associated with Exposure to Contaminants in the Water Supply at Camp Lejeune, 82 Fed. Reg. 4173 (Jan. 13, 2017).  The regulation provides that a veteran who served at least 30 days at Camp Lejeune between August 1, 1953, and December 31, 1987, "shall be presumed to have been exposed during such service to the contaminants in the water supply." 38 C.F.R. § 3.307(a)(7)(iii).  The regulation further provides that if the veteran develops one of eight specified diseases, the Department of Veterans Affairs "will presume that the individual concerned became disabled during that service" for certain purposes.  38 C.F.R. § 3.307(a)(7)(iv). Those eight diseases include two diseases not covered by the Janey Ensminger Act—liver cancer and Parkinson's disease—in addition to bladder cancer, kidney cancer, adult leukemia, multiple myeloma, aplastic anemia and other myelodysplastic syndromes, and non-Hodgkin's lymphoma. 38 C.F.R. § 3.309(f).

40.     Although the 2017 rule provides disability benefits to servicemembers, it does not provide other forms of compensation and it does not provide any compensation for non-servicemembers who were injured by the contaminated water at Camp Lejeune.

41.     In 2008, over a half century after the water at Camp Lejeune first became contaminated, the United States Navy began notifying affected individuals about "past water quality issues" at Camp Lejeune.   In light of that disclosure, over four thousand veterans and other individuals filed administrative claims with the Navy seeking compensation for the injuries.

42.     A number of injured servicemembers and others whose administrative claims were denied brought suits against the United States in various federal district courts under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671–2680.

43.     As a general matter, the complaints alleged that the government was negligent in its maintenance of the water supply system at Camp Lejeune and had failed to comply with its duty to warn servicemembers and others about their risk of developing cancer and other diseases and conditions from exposure to the water at Camp Lejeune.  The complaints explained that the United States had a legal duty to ensure that the water supply was safe for drinking and other purposes, properly constructing wells, and ensuring that the wells could not be contaminated by the surrounding land.  The complaints pointed to orders issued by the Department of Navy Bureau of Medicine and Surgery in 1972, known as "BUMEDS," that imposed a detailed set of requirements for ensuring water safety quality—orders that the United States had failed to follow.

44.     The complaints further alleged that United States personnel had themselves caused or permitted large quantities of chlorinated solvents and other contaminants to be dumped or disposed of within Camp Lejeune without warning residents.  The complaints also alleged that even after the United States knew or should have known that the water supply was dangerously contaminated, it failed to take the necessary steps to warn at-risk individuals and correct the problem.

45.     In 2011, the Camp Lejeune cases were consolidated in a Multi-District Litigation ("MDL") in the Northern District of Georgia (MDL No. 2218).

46.     On December 15, 2016, the District Court dismissed the claims on the basis of North Carolina's statute of repose without reaching the merits of the plaintiffs' negligence and

duty-to-warn claims.  *See In re Camp Lejeune N.C. Water Contamination Litig.*, 263 F. Supp. 3d 1318 (N.D. Ga. 2016).

47.     On May 22, 2019, the U.S. Court of Appeals for the Eleventh Circuit affirmed the District Court's dismissal.  *See In re Camp Lejeune, North Carolina Water Contamination Litig.*, 774 F. App'x 564 (11th Cir. 2019).

48.     In the wake of the District Court's decision, the Navy elected to deny all of the thousands of pending claims seeking compensation for harms caused by the government's failure to ensure safe water at Camp Lejeune.  The Navy took the position that it lacked the legal authority to pay the claims in light of the District Court's ruling.

49.     On August 10, 2022, the President signed into law the Camp Lejeune Justice Act of 2022.  The purpose of the legislation is to, *inter alia*, supersede the judicial rulings that barred recovery under the FTCA for individuals injured by the contaminated water at Camp Lejeune.

50.     Section 804(b) of the Act establishes a new federal cause of action specifically for those affected by the extensive contamination at Camp Lejeune.  It provides that:

> an individual, including a veteran (as defined in section 101 of title 38, United States Code), or the legal representative of such an individual, who resided, worked, or was otherwise exposed (including in utero exposure) for not less than 30 days during the period beginning on August 1, 1953, and ending on December 31, 1987, to water at Camp Lejeune, North Carolina, that was supplied by, or on behalf of, the United States may bring an action in the United States District Court for the Eastern District of North Carolina to obtain appropriate relief for harm that was caused by exposure to the water at Camp Lejeune.

51.     The Act "appl[ies] only to a claim arising before the date of enactment of this Act." The statute expressly incorporates the FTCA's requirement that a claim must be presented to the relevant federal agency before the judicial action may proceed.  Section 804(h) of the Act (cross-referencing 28 U.S.C. § 2675).  Under that provision, if the federal agency fails to make a final

disposition of a claim within six months of its filing, the claim is "deemed" denied, allowing the claimant to file an action in court. 28 U.S.C. § 2675(a).

52.     The Act makes clear that a plaintiff may obtain a recovery for a "latent disease." Section 804(e)(1).

53.     To meet the burden of proof under the Act, a plaintiff must only "produce evidence showing that the relationship between exposure to the water at Camp Lejeune and the harm is— (A) sufficient to conclude that a causal relationship exists; or (B) sufficient to conclude that a causal relationship is at least as likely as not."  Section 804(c)(2).

54.     The Act includes its own statute of limitations and expressly makes inapplicable any other statute of repose or statute of limitations.  Section 804(j).  The Act's statute of limitations provides that "[a] claim in an action under this section may not be commenced after the later of— (A) the date that is 2 years after the date of enactment of this Act; or (B) the date that is 180 days after the date on which the claim is denied under section 2675 of title 28, United States Code."  *Id.*

## COUNT ONE: CAMP LEJEUNE JUSTICE ACT

55.     Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

56.     Plaintiff DAVID FANCHER resided, worked or was otherwise exposed for not less than thirty (30) days between August 1, 1953 and December 31, 1987, to water at Camp Lejeune, North Carolina, that was supplied by, or on behalf of, the United States.

57.     Plaintiff LEE FUTRELL resided, worked or was otherwise exposed for not less than thirty (30) days between August 1, 1953 and December 31, 1987, to water at Camp Lejeune, North Carolina, that was supplied by, or on behalf of, the United States.

58.     Plaintiff JOHN ORUE resided, worked or was otherwise exposed for not less than thirty (30) days between August 1, 1953 and December 31, 1987, to water at Camp Lejeune, North Carolina, that was supplied by, or on behalf of, the United States.

59.     Plaintiff CRAIG UNTERBERG resided, worked or was otherwise exposed for not less than thirty (30) days between August 1, 1953 and December 31, 1987, to water at Camp Lejeune, North Carolina, that was supplied by, or on behalf of, the United States.

60.     Plaintiff ARIEL ALVARADO resided, worked or was otherwise exposed for not less than thirty (30) days between August 1, 1953 and December 31, 1987, to water at Camp Lejeune, North Carolina, that was supplied by, or on behalf of, the United States.

61.     Plaintiff DENNIS TOLES resided, worked or was otherwise exposed for not less than thirty (30) days between August 1, 1953 and December 31, 1987, to water at Camp Lejeune, North Carolina, that was supplied by, or on behalf of, the United States.

62.     Plaintiff CAROLE CARLSON resided, worked or was otherwise exposed for not less than thirty (30) days between August 1, 1953 and December 31, 1987, to water at Camp Lejeune, North Carolina, that was supplied by, or on behalf of, the United States.

63.     Plaintiff DENNIS MONROE resided, worked or was otherwise exposed for not less than thirty (30) days between August 1, 1953 and December 31, 1987, to water at Camp Lejeune, North Carolina, that was supplied by, or on behalf of, the United States.

64.     Plaintiff RICHARD HENDERSON resided, worked or was otherwise exposed for not less than thirty (30) days between August 1, 1953 and December 31, 1987, to water at Camp Lejeune, North Carolina, that was supplied by, or on behalf of, the United States.

65.     During this time, Plaintiffs were exposed to amounts of water supplied by Defendant or its agents at Camp Lejeune. The water supplied to Plaintiffs by or on behalf of

Defendant was polluted and contaminated as described herein with chemicals including but not limited to TCE, PCE, vinyl chloride and benzene.

66. Subsequently, Plaintiff DAVID FANCHER was diagnosed with multiple serious life-threatening illnesses, including kidney cancer, on a date before the enactment of the Act.

67. Subsequently, Plaintiff LEE FUTRELL was diagnosed with multiple serious life-threatening illnesses, including kidney cancer, on a date before the enactment of the Act.

68. Subsequently, Plaintiff JOHN ORUE was diagnosed with multiple serious life-threatening illnesses, including kidney cancer, on a date before the enactment of the Act.

69. Subsequently, Plaintiff CRAIG UNTERBERG was diagnosed with multiple serious life-threatening illnesses, including kidney cancer, on a date before the enactment of the Act.

70. Subsequently, Plaintiff ARIEL ALVARADO was diagnosed with multiple serious life-threatening illnesses, including kidney cancer, on a date before the enactment of the Act.

71. Subsequently, Plaintiff DENNIS TOLES was diagnosed with multiple serious life-threatening illnesses, including kidney cancer, on a date before the enactment of the Act.

72. Subsequently, Plaintiff CAROLE CARLSON was diagnosed with multiple serious life-threatening illnesses, including kidney cancer, on a date before the enactment of the Act.

73. Subsequently, Plaintiff DENNIS MONROE was diagnosed with multiple serious life-threatening illnesses, including kidney cancer, on a date before the enactment of the Act.

74. Subsequently, Plaintiff RICHARD HENDERSON was diagnosed with multiple serious life-threatening illnesses, including kidney cancer, on a date before the enactment of the Act.

75.     A causal relationship exists between each Plaintiff's illnesses, including their kidney cancer and the contaminants each Plaintiff was exposed to in the Camp Lejeune water supply.  The causal relationship is at least as likely as not.

76.     On or about February 10, 2011, Plaintiff DAVID FANCHER filed an administrative claim for compensation with the United States Navy pursuant to 28 U.S.C. § 2675. Subsequently, the Navy denied the claim or the claim was constructively denied pursuant to 28 U.S.C. § 2675(a) because the Navy failed to dispose of the claim within six months of the date of filing, thereby satisfying the requirements of the statute.

77.     On or about March 27, 2015, Plaintiff LEE FUTRELL filed an administrative claim for compensation with the United States Navy pursuant to 28 U.S.C. § 2675.  Subsequently, the Navy denied the claim or the claim was constructively denied pursuant to 28 U.S.C. § 2675(a) because the Navy failed to dispose of the claim within six months of the date of filing, thereby satisfying the requirements of the statute.

78.     On or about June 25, 2010, Plaintiff JOHN ORUE filed an administrative claim for compensation with the United States Navy pursuant to 28 U.S.C. § 2675.  Subsequently, the Navy denied the claim or the claim was constructively denied pursuant to 28 U.S.C. § 2675(a) because the Navy failed to dispose of the claim within six months of the date of filing, thereby satisfying the requirements of the statute.

79.     On or about February 15, 2017, Plaintiff CRAIG UNTERBERG filed an administrative claim for compensation with the United States Navy pursuant to 28 U.S.C. § 2675. Subsequently, the Navy denied the claim or the claim was constructively denied pursuant to 28 U.S.C. § 2675(a) because the Navy failed to dispose of the claim within six months of the date of filing, thereby satisfying the requirements of the statute.

80.    On or about February 26, 2013, Plaintiff ARIEL ALVARADO filed an administrative claim for compensation with the United States Navy pursuant to 28 U.S.C. § 2675. Subsequently, the Navy denied the claim or the claim was constructively denied pursuant to 28 U.S.C. § 2675(a) because the Navy failed to dispose of the claim within six months of the date of filing, thereby satisfying the requirements of the statute.

81.    On or about September 13, 2011, Plaintiff DENNIS TOLES filed an administrative claim for compensation with the United States Navy pursuant to 28 U.S.C. § 2675. Subsequently, the Navy denied the claim or the claim was constructively denied pursuant to 28 U.S.C. § 2675(a) because the Navy failed to dispose of the claim within six months of the date of filing, thereby satisfying the requirements of the statute.

82.    On or about February 10, 2015, Plaintiff CAROLE CARLSON filed an administrative claim for compensation with the United States Navy pursuant to 28 U.S.C. § 2675. Subsequently, the Navy denied the claim or the claim was constructively denied pursuant to 28 U.S.C. § 2675(a) because the Navy failed to dispose of the claim within six months of the date of filing, thereby satisfying the requirements of the statute.

83.    On or about November 16, 2010, Plaintiff DENNIS MONROE filed an administrative claim for compensation with the United States Navy pursuant to 28 U.S.C. § 2675. Subsequently, the Navy denied the claim or the claim was constructively denied pursuant to 28 U.S.C. § 2675(a) because the Navy failed to dispose of the claim within six months of the date of filing, thereby satisfying the requirements of the statute.

84.    On or about May 28, 2011, Plaintiff RICHARD HENDERSON filed an administrative claim for compensation with the United States Navy pursuant to 28 U.S.C. § 2675. Subsequently, the Navy denied the claim or the claim was constructively denied pursuant to 28

U.S.C. § 2675(a) because the Navy failed to dispose of the claim within six months of the date of filing, thereby satisfying the requirements of the statute.

## CLAIM FOR RELIEF

Plaintiffs respectfully request that, pursuant to Section 804 of the Act, the Court enter judgment against the United States and award damages and all other appropriate relief for the harm to Plaintiffs DAVID FANCHER; LEE FUTRELL; JOHN ORUE; CRAIG UNTERBERG; ARIEL ALVARADO; DENNIS TOLES; CAROLE CARLSON; DENNIS MONROE; and RICHARD HENDERSON that was caused by exposure to the water at Camp Lejeune.

## JURY TRIAL DEMAND

Plaintiffs demand a trial by jury of all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure and Section 804 of the Act.

*[Signatures follow on next page]*

Respectfully submitted,

MOTLEY RICE LLC

*s/ John D. Hurst*
John D. Hurst (N.C. Bar No.: 37680)
Kevin R. Dean (to make special appearance)
W. Christopher Swett (to make special appearance)
28 Bridgeside Boulevard
Mount Pleasant, SC  29464
jhurst@motleyrice.com
kdean@motleyrice.com
cswett@motleyrice.com
Phone (843) 216-9000
Fax (843) 216-9440


LEWIS & ROBERTS, PLLC

*/s/ James A. Roberts, III*
James A. Roberts, III (N.C. Bar No.: 10495)
Matthew D. Quinn (N.C. Bar No.: 40004)
3700 Glenwood Avenue, Suite 410 (27612)
P. O. Box 17529
Raleigh, NC 27619-7529
jar@lewis-roberts.com
mdq@lewis-roberts.com
Phone (919) 981-0191
Fax (919) 981-0199

ATTORNEYS FOR PLAINTIFFS

August 10, 2022